**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com
          slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
          aleslie@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AZMAN HUSSAIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BURGER KING CORPORATION,<br><br>Defendant. | Case No. 4:22-CV-02258-HSG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Azman Hussain ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Burger King Corporation ("Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF ACTION

1.     Plaintiff brings this Class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's Whopper or French Fries (the "Products"), which are unfit for human consumption because the packaging in which they are contained—and is essential and integral to delivering the Products to the consuming public[1]—contain heightened levels of organic fluorine and unsafe per- and polyfluoralkyl substances ("PFAS").[2]

2.     PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[3]

3.     In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with

---

[1] Due to the integral and essential nature of the packaging, the term "Products" is used herein to denote both the Products and the Products' packaging.

[2] Discovery may reveal that additional Burger King products are within the scope of this Complaint.  Accordingly, Plaintiff reserves the right to include additional food products identified throughout the course of discovery.

[3] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.

PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[4]

4.      Despite Defendant's representations to consumers that its products are "safe," and "sustainable," including on its website and the Products' packaging—which are an essential and integral part of delivering the Products to consumers—independent research conducted by Dr. Lara Schultes of Stockholm University and Dr. Graham Peaslee of the University of Notre Dame and published in *Environmental Science & Technology Letters* in February 2019, determined that the packaging for Defendant's French Fries contain harmful PFAS.

5.      Subsequent testing performed more than two years later by Consumer Reports[5] determined that the packaging for both Products contain measurable amounts of organic fluorine, which is indicative of the existence of PFAS.  Specifically, Consumer Reports determined that the Product packaging for the Whopper contained 249.7 parts per million (ppm) of total organic fluorine while the packaging for the French Fries contained 13 ppm of organic fluorine.[6]

6.      Additional testing commissioned by Plaintiff's counsel in May of 2022 and conducted by Galbraith Laboratories confirmed the existence of organic fluorine in the packaging for the Whopper.

7.      Defendant relies on many of the same suppliers for each of the Products' packaging and has not substantially or meaningfully altered its suppliers for the Products' packaging for several years.  In addition, Defendant has not substantially or meaningfully altered the components comprising the Products' packaging within the past several years.

8.      Because the packaging for the Products is comprised of similar and unaltered components, both have tested positive for organic fluorine, which is itself indicative of PFAS, and

---

[4] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last visited June 23, 2022).

[5] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited June 23, 2022).

[6] Organic fluorine results identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources.

the packaging for the French Fries has tested positive for certain named and harmful PFAS, it is safe to assume that the packaging for the Whopper is also comprised of certain named PFAS.

9.      Based on Defendant's representations, a reasonable consumer would expect that the Products can be safely purchased and consumed as marketed and sold.  However, the Products are not safe and pose a significant health risk to unsuspecting consumers.  Nor are the Products sustainable.  Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiff that their Products are unsafe and harmful to the environment, contain heightened levels of organic fluorine and certain named PFAS, or should otherwise be approached with caution.

10.      Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all other similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, et seq. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, et seq.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had And Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation; (12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; and (14) Negligent Failure to Warn.

## THE PARTIES

11.      Plaintiff Azman Hussain is a natural person and citizen of California who resides in Fremont, California.  Plaintiff Hussain has purchased the Products from Defendant for several years, including as recently as March 2022 from a Burger King located in Fremont, California. Prior to his purchase, Mr. Hussain reviewed the labeling, packaging, and marketing materials of his Products, including those set out herein, including that the Products were safe and sustainable.  Mr. Hussain understood that based on Defendant's claims, that Products were safe for consumption, and otherwise sustainable products.  Mr. Hussain reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have

purchased them on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. Hussain suffered and continues to suffer, economic injuries.

12.    Mr. Hussain continues to desire to purchase the Products from Defendant. However, Mr. Hussain is unable to determine if the Products are actually safe and sustainable.  Mr. Hussain understands that the composition of the Products may change over time.  But as long as Defendant continues to market its products as "safe" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Product and competitor's Products.  Mr. Hussain is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

13.    Defendant Burger King Corporation ("Defendant") is a foreign corporation with its principal place of business located in Miami, Florida.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

15.    This Court has personal jurisdiction over Defendant transacts substantial business in this District, has substantial aggregate contacts with this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout this District, and purposefully availed itself of the laws of the State of California in this District, because the acts and transactions giving rise to this action occurred in this District.

16.    This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

1

**FACTUAL ALLEGATIONS**

2

    **A.    Food and Consumer Preferences**

3

    17.    According to a recent survey, chemicals in food (including carcinogens or cancer-

4

causing chemicals) represent the most important food safety issue to consumers.[7]   Consumers

5

ranked this concern more highly than any other concern, including foodborne illness from bacteria

6

and use of pesticides.[8]

7

    18.    At the same time, awareness of, and an inclination toward, safer products is guiding

8

consumer choices.   One survey, for instance, found that "when asked to choose the top three

9

factors they prioritize when deciding between products, the majority of consumers surveyed said

10

they prioritize the health/safety of products (71%) and products free of certain toxic chemicals

11

(70%)."[9]

12

    19.    These findings extend to the packaging of products, with 82% of consumers

13

agreeing that "it is important for brands to balance safety and concern for the environment when

14

designing product packaging."[10]

15

    20.    Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product

16

they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more,

17

and 17% willing to spend 1-5% more."[11]

18

    21.    Thus, there is enormous incentive for companies such as Defendant to market their

19

products as safe and sustainable.   Indeed, Defendant has repeatedly and pervasively touted these

20

considerations as reasons to purchase the Products over competitors.   Examples of these

21

representations are included below.

22

23
[7] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited June 23, 2021).

24
[8] *Id.*

25
[9] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-content/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).

26

27
[10] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage-processors/ (last visited June 23, 2022).

28
[11] Made Safe, "What Shoppers Want," at 3.

22.    These include statements made directly on Defendant's website such as "Have it Your Way, the Real way[:] All the flavors you crave without the ingredients you don't."[12]



23.    Defendant states on its website that "As a corporation, we define corporate responsibility as looking beyond a strong bottom line to consider the impact of everything we do. It's about doing the right thing as a corporate citizen in today's global marketplace while successfully meeting business goals and objectives."[13]

24.    Defendant states on its website that "We continuously review our policies on animal welfare, sourcing and environmental impact to ensure that we remain good corporate citizens in the communities we serve."[14]

25.    Defendant prominently claims on its partner's website that "Burger King is on a mission to transform business, achieving the highest standards for food quality, sustainability, and experience in the QSR [quick-service restaurant] industry."[15]

---

[12] Burger King, "Food Quality," https://www.bk.com/food-quality (last visited June 23, 2022).

[13] Burger King, "BK Corporate Responsibility," https://www.bk.com/corp-respon (last visited June 23, 2022).

[14] *Id.*

[15] Jones Knowles Ritche, "Burger King," https://jkrglobal.com/case-studies/burger-king/ (last visited June 23, 2022).

26.    To do so, Defendant claims that "For Burger King's first global rebrand in more than two decades, we set out to make the brand feel less synthetic and artificial, and more real, crave-able and tasty."[16]

27.    By this, according to Rapha Abreau, Vice President, Global Head of Design at Restaurant Brands International, Defendant intended the following: "As our business evolves, we felt that our brand personality, attributes, and all that work we've done around food quality should be better reflected in our visual identity."[17]

28.    And Defendant has achieved this goal, amplifying this ethos in the visual design of its packaging, which, as Defendant notes, "evokes the natural, organic shape of food.  Warmer colors bring vibrant, fresh ingredients and the brand's trademark flame-grilling method to life in packaging[.]"[18]

29.    To this point, Defendant prominently claims on billboards as captured in the following photograph, and which is further portrayed on its partner's website as well as in commercials, that "We want to look how we taste."[19]



---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

30.     Here, Defendant emphasizes its "natural" and "green" bona fides, seeking to convince consumers that they are making conscientious decisions by purchasing food from Burger King.

31.     Defendant further embodies this ethos in its marketing as collected on its partner's website, noting that there are "No secrets in our sauce."[20]



32.     Defendant also reiterates this "no secrets" message in other advertisements such as the following, which is prominently featured on its website, emphasizing there "there shouldn't be any secrets in our sauce (or anything else)."

![BK is keeping it Real tender, Real crispy, Real melty. We've made a bold new commitment to Have it Your Way because there shouldn't be any secrets in our sauce (or anything else).]

---

[20] *Id.*

1          33.     Defendant also embodied this ethos in its commercials announcing the rebrand,

2  stating that "It's the start of a NEW ERA[.] We're more REAL[.]"[21]

3          34.     At the same time, Defendant's commercial introduces the Product in its packaging

4  as the following photographs demonstrate:[22]





[21] The official rebrand introduction video for Burger King,
https://www.youtube.com/watch?v=xwH4oVnuIAs (last visited June 23, 2022).
[22] *Id.*

35.     This notion is echoed by the Global Chief Marketing Officer of Restaurant Brands International, Fernando Machado who, according to eslogan Marketing Magazine—following an interview—"'We are marking serious commitments around sustainability and enhancing the experience, especially the digital experience.  Because we are going through that transformation, we wanted the design to basically tell people what has changed.'"[23]

36.     This led eslogan Marketing Magazine to thus opine that "The most motivating factor in creating Burger King's new visual identity has been the company's change towards transparency and sustainability."[24]

37.     Thus, when consumers, like Plaintiff interact with Defendant's packaging, they expect it to embody Defendant's brand, which as noted above, has continuously emphasized safety and sustainability.

38.     And Defendant's recognized this in its report to investors immediately following the rebrand, noting that "Earlier this year, we announced the first global visual identity update at Burger King in 20 years.  The team spent most of 2020 doing the hard work of tying together all the essential elements for a unified visual identity, including our logo, colors, uniform, restaurant design, digital platforms and packaging—all designed to build brand love."[25]

39.     At the same time, Defendant, through its CEO, Jose Cil, announced to its investors that "We advanced work on sustainable packaging and recycling; created new policies on animal welfare and deforestation; made large shifts in our use of real ingredients and concluded a comprehensive carbon footprint analysis that will allow us to make substantive new commitments in 2021."[26]

---

[23] Eslogan Marketing Magazine, "Burger King's new visual identity, a 'sustainable' new logo," https://en.esloganmagazine.com/burger-king-new-visual-identity/ (last visited June 23, 2022).

[24] Id.

[25] Restaurant Brands International, "Open Letter: What a Difference a Year Made," (Feb. 11, 2021), https://www.rbi.com/English/news/news-details/2021/Open-Letter-What-a-Difference-a-Year-Made/default.aspx (last visited June 23, 2022).

[26] Id.

40.     Consumers would not expect that the Product which is profiled in the reigning in of a "NEW ERA" with better ingredients with no secrets, would contain the biggest secret of all: heightened levels of organic fluorine and cancer causing PFAS in those very Products' packaging.

41.     As described in the next section, despite Defendant's rebrand, Defendant's Products are not safe for consumption, and poses a critical risk to the safety and health of consumers.

**B.     PFAS In Food Packaging Is Harmful To Humans And The Environment**

42.     Dr. Schultes' and Dr. Peaslee's research published in *Environmental Science & Technology Letters* in February 2019 revealed that the packaging for Defendant's French Fries contain harmful PFAS, including perfluorohexanoic acid ("PFHxA"), perfluorohexane sulfonate ("1-PFHxS"), perfluorooctane sulfonate ("1-PFOS"), perfluorododecanoic acid ("PFDoDA"), perfluorotetradecanoic acid ("PFTeDA"), 6:2 fluorotelomer phosphate diester ("6:2 diPAP"), and 8:2 fluorotelomer phosphate diester ("8:2 diPAP"), amongst several others.

43.     The health risks from these PFAS are serious.  For example, the Environmental Protection Agency ("EPA") has indicated that PFHxA can cause hepatic, developmental, and hematopoietic effects in humans.

44.     Several of the others are known to cause thyroid disruption, induce apoptosis, or the death of cells, hepatotoxicity, neurotoxicity, reproductive toxicity, immunotoxicity, renal toxicity, oxidative stress, osteoarthritis, decreased antibody response to vaccines, amongst a multitude of other harmful effects.

45.     The researchers' study built on the 2018 published findings by Toxic Free Future which demonstrated that the Products contained heightened levels of organic fluorine.[27]

46.     These results were replicated and expanded upon by Consumer Reports in March 2022.  The results of that testing are set out below:

---

[27] Jen Dickman, *et al.* "Packaged in Pollution: Are food chains using PFAS in packaging?" https://toxicfreefuture.org/packaged-in-pollution/ (last visited Mar. 30, 2022).

### Burger King

| | | | |
|---|---|---|---|
| Bag for cookies, French toast sticks | 🟥 🟥 | 345.7 |
| Wrapper for Whopper | 🟥 🟥 | 249.7 |
| Bag for chicken nuggets | 🟥 🟥 | 165.0 |
| Container for french fries | | 13.0 |
| Container for chicken, french fries | | 12.0 |
| Container for tater tots | | 8.5 |

47.     As demonstrated, despite containing significantly less organic fluorine than the wrapper for the Whopper, the French Fries' container contains a material amount of PFAS.

48.     Additionally, Plaintiff conducted further testing at Galbraith Laboratory in May 2022 and, again, found heightened levels of organic fluorine.

49.     The reason companies like Defendant use organic fluorine and PFAS in their food packaging products is simple: the coating acts "as a barrier to keep grease from escaping" and "from leaking into people's hands."[28]

50.     But PFAS are not necessary for this intended outcome.   Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no detectable levels of organic fluorine.[29]   Accordingly, Defendant would have had knowledge that it could produce the Product packaging without the heightened levels of PFAS inherent in its current composition.

51.     Yet, Defendant chose not to, and instead concealed this information from consumers, to increase by the cost savings associated with using these chemicals.

---

[28] Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last visited June 23, 2022).

[29] *See supra* n. 27 and *supra* n. 6.

52.     This has not been without consequences for consumers, as PFAS in food packaging migrates[30] onto the food, exposing consumers to PFAS via ingestion. [31]

53.     Worryingly, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which make them highly persistent both in the environment and in human bodies.

54.     That these substances are harmful to the human body is beyond dispute.  In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[32]

55.     A figure from the European Environmental Agency ("EEA") shows that "effects of PFAS on human health:"[33]



---

[30] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784

[31] See Nat'l Toxicology Program, Per- and Polyfluoroalkyl Substances (PFAS), https://ntp.niehs.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last visited June 23, 2022).

[32] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last visited June 23, 2022).

[33] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed June 23, 2022).

56.     The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[34]

57.     In total, this research demonstrates that the risk of severe complications arising from exposure to PFAS is both credible and substantial.

58.     The harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated in the figure below:[35]



59.     Once introduced, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears, often making their way to dinner tables of people who did not even purchase the Product.[36]

///

///

---

[34] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS," https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed June 23, 2022).

[35] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed June 23, 2022).

[36] Id.

**C.     Defendant's Misrepresentation and Omissions Are Actionable**

60.     Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as safe and sustainable when they are not in fact safe and sustainable.

61.     Plaintiff and Class Members bargained for products that are safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them Products in packaging containing dangerous substances with well-known health and environmental consequences.

62.     No reasonable consumer would expect that the Products marketed as safe for human consumption and sustainable would pose a risk to their health, safety, and wellbeing, or that it would contain heightened levels of organic fluorine and dangerous PFAS, which are indisputably linked to harmful health effects in humans and the environment.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

63.      As the Products expose consumers to organic fluorine and PFAS that pose a risk to consumers' health, the Products are not fit for consumption by humans.  Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to heightened levels of organic fluorine and toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

64.     Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects.   Nonetheless, Defendant concealed and affirmatively misrepresented the Products, as discussed herein.

65.     Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the PFAS and its failure to disclose the existence of PFAS in the Products to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

66.    **WHO**:  Defendant made material misrepresentations and/or omissions of fact about the Products through its labeling, website representations, and marketing statements, which include the statements that the Products are safe and sustainable.  These representations constitute omitted material information regarding harmful chemicals in the Products packaging which is essential and integral to delivering the Product to the consumer.

67.    **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent because they omitted and concealed that the Products contain substances—organic fluorine and PFAS—that are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe and sustainable, when they are not.  Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner.

68.    **WHEN**:  Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products' packaging contained harmful substances.

69.    **WHERE**:  Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Product's packaging, website, and through marketing materials.

70.    **HOW**:  Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of heightened organic fluorine and PFAS.

71.    **WHY**:  Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

72.    **INJURY**:  Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

73.     Defendant would have had actual knowledge for years that the Products' packaging contains harmful chemicals such as heightened levels of organic fluorine and PFAS.

74.     Although Defendant was aware of the deception in its labeling given the inclusion of organic fluorine and PFAS in the Product despite claims of the Products' safety and sustainability, they took no steps to warn Plaintiff or Class Members of risks related to PFAS in the Products.

75.     Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products.  Defendant had a duty to disclose the true nature and quality of the Products and to disclose the health and safety risks associated with the Products.

76.     Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Products, including that the Products are safe and sustainable.

77.     Defendant concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products.  Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.  Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

78.     The organic fluorine and PFAS included in the formulation, design and/or manufacture of the Product packaging were not reasonably detectible to Plaintiff and Class Members.

79.     At all times, Defendant actively and intentionally concealed the existence of the organic fluorine and PFAS and failed to inform Plaintiff or Class Members of the existence of the organic fluorine and PFAS.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

80.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Product packaging contained harmful chemicals.

81.     Defendant concealed or misrepresented the organic fluorine and PFAS for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

82.     As a result of Defendant's active concealment of the organic fluorine and PFAS and/or failure to inform Plaintiff and Class Members of the PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Products.

83.     Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Products contained organic fluorine and PFAS, which, at the very earliest, would have been in March 2022.  Plaintiff and Class Members had no realistic ability to discern that the Products contained organic fluorine PFAS until after the widely publicized Consumer Report's study.  Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of organic fluorine and PFAS in the Products and of the Products' true nature.

## CLASS ALLEGATIONS

84.     Plaintiff brings this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the State of California who purchased the Product (the "Class").  Excluded from the Class are persons who made such purchases for purposes of resale.

85.     As a result of additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate.

86.     At this time, Plaintiff does not know the exact number of members of the aforementioned Class ("Class Members").  However, given the nature of the claims and the number Defendant's restaurants in California selling Defendant's Product, Plaintiff believes that Class Members are so numerous that joinder of all members is impracticable.

87.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to Class Members predominate over questions that may affect individual Class Members include:

(a) whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

(b) whether Defendant's conduct was unfair and/or deceptive;

(c) whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

(d) whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages;

(e) whether Defendant violated the California Consumers Legal Remedies Act;

(f) whether Defendant violated the California Unfair Competition Law.

88. Plaintiff's claims are typical of those of the Class because Plaintiff, like all Class Members, purchased, in a typical consumer setting, Defendant's Product, and Plaintiff sustained damages from Defendant's wrongful conduct.

89. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

90. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment

of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
### (Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

91.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

92.     Plaintiff brings this claim individually and on behalf of the Class against Defendant.

93.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

94.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the Class, by engaging in unlawful, fraudulent, and unfair conduct.

95.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

96.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers.  In addition, Defendant have committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

97.     Plaintiff and the Class Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

98.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.    Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to

consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

99.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

100.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

101.     Plaintiff and the other Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

102.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

103.     Plaintiff and the other Class Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

104.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other Class Members.

105.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the Class seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other Class Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and Class members' attorneys' fees and costs.

106.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an

amount less than the premium price of the Product. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

107.    Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

108.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the organic fluorine and PFAS in the Product packaging; or (2) the removal of such chemicals from the Product packaging, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

**<u>COUNT II</u>**
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code § 1750, *et seq.*)**

109.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

110.    Plaintiff brings this claim individually and on behalf of the Cass against Defendant

111.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

112.    Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

113.    Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

114.    Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as safe and sustainable, when in fact the Product is not safe, dangerous, and useless.

115.    The Products are not safe because they contain a heightened level of organic fluorine and PFAS in the packaging which is essential and integral to the delivery of the Products to consumers that subject unsuspecting consumers to significant health risks.

116.    Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiff or Class Members.

117.    Defendant made partial representations to Plaintiff and Class Members, while suppressing the true nature of the Products.  Specifically, by displaying the Products and describing the Products as safe and sustainable, including on the packaging, on its website, and in its marketing, without disclosing that the Products were unsafe and detrimental to human health and the environment.  As described above, Defendant was in receipt of knowledge pertaining to organic fluorine and PFAS in their Products and yet for a period of several years has continued to sell the Products.  Moreover, Defendant affirmatively misrepresented the Products despite its knowledge that the Products were not as advertised.

118.    Plaintiff and Class Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

119.    On April 1, 2022 and again on April 4, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant refused to correct its practices.  Accordingly, Plaintiff, individually, and on behalf of the proposed Class, seeks, in addition to injunctive relief, monetary damages from Defendant as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

120.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

121.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

122.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the organic fluorine and PFAS in the Products' packaging; or (2) the removal of such chemicals from the Products' packaging, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

## COUNT III
### (Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq.* and California Commercial Code § 2314)

123.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

124.     Plaintiff brings this claim individually and on behalf of the Class against Defendant.

125.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose

and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

126.    The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

127.    Plaintiff and the Class Members who purchased the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

128.    Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Product to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

129.    Defendant impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Products were unsafe for consumption. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

130.    Plaintiff and Class Members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Products.

131.    The Products were not altered by Plaintiff or the Class Members.

132.    The Products were defective at the time of sale when they it the exclusive control of Defendant.  The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

133.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

134.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use and posed a significant safety risk.

135.    Plaintiff and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

**COUNT IV**
**(Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.*)**

136.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

137.    Plaintiff brings this claim individually and on behalf of Class against Defendant.

138.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Products as safe and sustainable when, in fact, the Products were not safe and not sustainable.

139.    By its actions, Defendant disseminated uniform advertising regarding the Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

140.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain substances that pose a significant risk to the health and wellbeing of Plaintiff and the Class Members as well as to the environment.

141.    Defendant continues to misrepresent to consumers that the Products were safe and sustainable.  However, as described, this is not the case.

142.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other Class Members based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiff and Class Members were injured in fact and lost money and property as a result.

143.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

144.    As a result of Defendant's wrongful conduct, Plaintiff and Class Members lost money in an amount to be proven at trial.  Plaintiff and Class Members are therefore entitled to restitution as appropriate for this cause of action.

145.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

146.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

147.    Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

148.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the organic fluorine and PFAS in the Products' packaging; or (2) the removal of such chemicals from the Products' packaging, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

**COUNT V**
**(Fraud)**

149.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

150.    Plaintiff brings this claim individually and on behalf of the Class.

151.    At the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as safe and sustainable.

152.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of products that are indeed safe for consumption and otherwise sustainable.

153.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

154.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

155.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

156.    Plaintiff and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Products.

157.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT VI**
**(Constructive Fraud)**

158.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

159.    Plaintiff brings this claim individually and on behalf of the Class.

160.    At the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

161.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of products that are indeed safe for consumption and otherwise sustainable.

162.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

163.    Defendant had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiff and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

164.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

165.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

166.    Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Product, and what information was available regarding the Products.

167.    Defendant breached its duty to Plaintiff and Class Members to make full disclosures of the safety of their Products.

168.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Inducement)

169.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

170.    Plaintiff brings this claim individually and on behalf of the Class.

171.   Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

172.   Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

173.   Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

174.   Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

175.   Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

176.   Plaintiff and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Products, and what information was available regarding the Products.

177.   Defendant intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the Products based upon its affirmative representations and omissions.

178.   Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VIII
### (Money Had and Received)

179.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

180.   Plaintiff brings this claim individually and on behalf of the Class.

181.   As a result of the Plaintiff's and Class Members' purchase of the Products, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and Class Members in an amount to be determined at trial.

182.   No part of any of the monies due and owing to Plaintiff and Class Members has been repaid, although Plaintiff and Class Members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

183.   Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

184.   Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

## COUNT IX
### (Fraudulent Concealment or Omission)

185.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

186.   Plaintiff brings this claim individually and on behalf of the Class.

187.   At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Product.

188.   Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

189.   Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

190.   Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.

191.   Defendant made these material misrepresentations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a reputable company and that its Products are safe for consumption and otherwise sustainable.  The false representations

were material to consumers because the representations played a significant role in the value of the Products purchased.

192.    Plaintiff and Class Members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout.   Plaintiff and Class Members had no way of knowing that Defendant's misrepresentations as to the Products and had no way of knowing that Defendant's misrepresentations were misleading.

193.    Although Defendant had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

194.    Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Products.   Such benefits came at the expense of Plaintiff and Class Members.

195.    Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.   Plaintiff's and class members' actions were justified given Defendant's misrepresentations.   Defendant was in the exclusive control of material facts, and such facts were not known to the public.

196.    Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Products that did not live up to its advertised representations. Plaintiff and Class Members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.

197.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.   Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### COUNT X
### (Fraudulent Misrepresentation)

198.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

199.   Plaintiff brings this claim individually and on behalf of the Class.

200.   Defendant falsely represented to Plaintiff and the Class that the Products were safe for use and otherwise sustainable.

201.   Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Products.

202.   Defendant knew or should have known that its representations about the Products were false in that the Products are not safe for consumption and sustainable as discussed throughout.   Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

203.   Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment.   Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiff's and the Class' reliance on Defendant's misrepresentations was justifiable.

204.   As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the Product and that it does not conform to the Product's labels, packaging, advertising, and statements.

205.   Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

### COUNT XI
### (Negligent Misrepresentation)

206.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

207.   Plaintiff brings this claim individually and on behalf of the Class.

208.   Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Product.

209.   Defendant breached its duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

210.   Defendant knew or should have known that the qualities and characteristics of the Product were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Products were not safe for consumption and not sustainable.

211.   As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not safe for consumption and that the Products do not conform to the Products' labeling, packaging, advertising, and statements.

212.   Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT XII
### (Quasi-Contract / Unjust Enrichment)

213.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

214.   Plaintiff brings this claim individually and on behalf of the Class.

215.   To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

216.   Plaintiff and Class Members conferred benefits on Defendant by purchasing the Product.

217.   Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product was unfit for its intended purpose as it was unsafe for use.  These omissions caused injuries to Plaintiff

and Class Members because they would not have purchased the Products if the true facts were known.

218.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

219.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

220.     Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

## COUNT XIII
### (Breach of Express Warranty)

221.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

222.     Plaintiff brings this claim individually and on behalf of the Class.

223.     Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased the Products.

224.     The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.

225.     This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

226.    As set forth above, Defendant purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is otherwise sustainable.

227.    Plaintiff and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

228.    Defendant breached express warranties about the Products and their qualities because despite Defendant's warranties that the Products are safe for consumption and otherwise sustainable the Products are objectively not in fact safe for consumption and not sustainable.  Thus, the Products did not confirm to Defendant's affirmations and promises described above.

229.    Plaintiff and each Class Member would not have purchased the Products had they known the true nature of the Products.

230.    As a result of Defendant's breach of warranty, Plaintiff and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

## COUNT XIV
### (Negligent Failure to Warn)

231.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

232.    Plaintiff brings this claim individually and on behalf of the Class.

233.    At all relevant times, Defendant were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products and its packaging.  At all relevant times, it was reasonably foreseeable by Defendant that the use of the Products in their intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Products.

234.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

235.    Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of the Products.

236.    At minimum, the duty arose for Defendant to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

237.    Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Products, including Plaintiff and the Class, regarding the true nature of the Products, their risks, and potential dangers.

238.    Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Products contain ingredients known to cause adverse health effects in humans.

239.    Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Products as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks. Defendant failed to exercise reasonable care in providing Plaintiff and the Class with adequate warnings.

240.    As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Product, including its intended use, could cause and has caused injuries and other damages, Plaintiff and the Class have suffered damages, as described herein. Plaintiff also requests medical monitoring as a means to safeguard their health and mitigate any damages for future medical treatment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff, the Class on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper;

(h)   For medical monitoring as a means to safeguard Plaintiff's and Class Members health and to mitigate any damages for future medical treatment; and

(i)   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: June 27, 2022                                      Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
         slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163

E-Mail: jarisohn@bursor.com
aleslie@bursor.com

*Attorneys for Plaintiff and the Putative Class*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Azman Hussain who resides in Fremont, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California.  Additionally, Defendant transacts substantial business in this District, including purchases of the Products at issue, and Defendant advertised and marketed the Products at issue to Plaintiff in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed at Walnut Creek, California this 27th day of June, 2022.

_/s/ L. Timothy Fisher_
L. Timothy Fisher